UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NC INTERACTIVE, LLC, a Delaware limited liability company,<br><br>                                    Plaintiff,<br><br>       v.<br><br>AMBER STUDIO S.A., a Romanian company,<br><br>                                    Defendant. | Case No. 2:22-cv-1251<br><br>**COMPLAINT FOR BREACH OF CONTRACT, UNJUST ENRICHMENT, AND COPYRIGHT INFRINGEMENT** |

## I.    INTRODUCTION

1.      Plaintiff NC Interactive, LLC ("NC Interactive") brings this action against Amber Studio S.A. ("Amber") for breach of contract, unjust enrichment, and copyright infringement. NC Interactive and Amber were parties to a Game License Agreement (the "Agreement") to develop a game known as *Criminal Empire* (the "Game."). The Agreement gave Amber a limited, non-assignable and non-sublicensable right to use certain of NC Interactive's intellectual property. Amber agreed to use that intellectual property to develop the Game and Game-related services.

2.      Amber not only failed to adhere to its contractual obligations under the Agreement, but Amber also gave NC Interactive's intellectual property and confidential information to a third party known as The Syndicate Production PTE Ltd. ("Syndicate"). Amber transferred NC Interactive's intellectual property to Syndicate without NC Interactive's knowledge or consent.

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Rather than develop the Game, Amber and Syndicate formed an agreement to create and monetize non-fungible tokens ("NFT") using characters and other images from among NC Interactive's intellectual property.

3.     Amber and Syndicate created and sold the NFT, generating millions of dollars in revenue. Amber has refused to pay NC Interactive any amount arising from Amber's misuse of NC Interactive's property. Amber has also harmed the value of NC Interactive's licensed intellectual property and reduced the likelihood of generating goodwill associated with such assets by creating confusion in the marketplace as to the forthcoming existence of the Game.

4.     NC Interactive brings this action to recover damages it suffered as a result of Amber's breach of the Agreement, to recover all amounts by which Amber was unjustly enriched through the unauthorized use of NC Interactive's intellectual property and confidential information, to recover for infringement of NC Interactive's copyrighted material, and to obtain an injunction against Amber's further use of NC Interactive's intellectual property.

## II.     PARTIES AND CORPORATE DISCLOSURE STATEMENT

5.     Plaintiff NC Interactive, LLC is a Delaware limited liability company with its principal place of business in Bellevue, Washington. NC Interactive's sole member is NC West Holdings, Inc., a Delaware corporation, which is a wholly owned subsidiary of NCSOFT Corporation, a publicly-traded Korean corporation.

6.     Defendant Amber Studio S.A. is a Romanian company with its principal place of business in Bucharest, Romania.

## III.     JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the controversy is between citizens of different states and/or of a foreign state, and the amount in controversy exceeds $75,000.

COMPLAINT - 2
Case No. 2:22-cv-1251

8.      This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the federal Copyright Act, 17 U.S.C. § 101, et seq. This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

9.      This Court has personal jurisdiction under RCW 4.28.080 and Federal Rule of Civil Procedure 4 because, under Section 13(b) of the Agreement, Amber agreed that "[a]ll disputes between the Parties arising from or related to this Agreement shall be subject to the exclusive jurisdiction of the state and federal courts sitting in the State of Washington."

10.     Venue in this district is proper under 28 U.S.C. § 1391(b)(2), or in the alternative, § 1391(b)(3).

## IV.     FACTUAL ALLEGATIONS

11.     NC Interactive is a developer, owner, and service provider of various game software.

12.     In 2019, NC Interactive paid Amber to develop the Game on a work-for-hire basis, pursuant to which NC Interactive held ownership of all intellectual property and confidential information created by Amber. Amber developed source code, images, characters and other game-related property under the 2019 agreement. NC Interactive owns intellectual property rights in connection with the Game, including graphics, logos, trademarks, characters, and source code associated with the Game.

13.     In April 2020, NC Interactive released the Game for sale exclusively in the Philippines as part of an initial launch of the Game. Thus, the Game was first published in the Philippines and is a foreign work.

14.     In 2020, NC Interactive, under the name of its subsidiary, GoldSlugz Games, LLC, briefly published the Game on the Apple and Google Play mobile app stores. The game appeared as follows:

COMPLAINT - 3
Case No. 2:22-cv-1251

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

*See* https://play.google.com/store/apps/details?id=com.goldslugz.criminal.empire&hl=en_US&gl=US

15.     Shortly thereafter, NC Interactive elected to "shelve" the Game and cease further work. Amber then indicated a willingness to license the Game assets from NC Interactive and develop the Game itself.

**The License Agreement**

16.     On September 25, 2021, NC Interactive and Amber entered into the Agreement to develop the Game. A copy of the Agreement is attached as Exhibit A.

17.     The crux of the Agreement was Amber's creation and publication of a playable video game using the then-existing Game assets as a starting point. Taken together, the provisions of the Agreement called for a series of events, including the creation of a written development and launch plan, which would eventually result in Amber making the Game available for sale to and use by the public. This date was defined as the Commercial Launch Date. *See* Agreement Section 1(c) (defining "Commercial Launch Date").

18.     To allow Amber the rights necessary to develop the Game, NC Interactive granted Amber an exclusive, non-assignable, non-sublicensable, royalty-bearing license related to development, marketing, and distribution of the Game. *Id.* Section 2(a). Specifically, NC Interactive granted Amber the right to "distribute, provide, display, use, publish, market, operate,

COMPLAINT - 4
Case No. 2:22-cv-1251

and/or manage or otherwise exploit" the Game, Game Services, and Game Derivative Works, as well as the right to provide customer support, advertise, and collect fees in connection with the Game." *Id.*

19.    In addition, NC Interactive granted Amber a non-exclusive, non-assignable, non-sublicensable license to use graphics, logos, trademarks, service marks, and characters associated with the Game (the "Game Marks"). *Id.* Sections 1(n), 2(b)(i). Amber was required to obtain NC Interactive's prior written approval before using the Game Marks. *Id.* Section 2(b)(ii). Amber was also prohibited from taking any action that harms or could reasonably be expected to harm goodwill associated with the Game Marks and NC Interactive's other brands. *Id.*

20.    NC Interactive expressly ***did not*** grant Amber the right to sub-license or assign the Game or NC Interactive's intellectual property to any third party. NC Interactive also did not grant Amber the right to use NC Interactive's intellectual property for purposes other than those specified in Section 2(a) of the Agreement. All use of the licensed property and work was to be performed by Amber.

21.    Under the Agreement, Amber was required to perform several obligations. Specifically, within 60 days of the Agreement's effective date, Amber was required to submit to NC Interactive a written plan for further development and improvement of the Game; a proposal for what Game Services will be offered to End Users; and a written plan for distributing and publishing the Game. *Id.* Section 3(b). Within six months of the Agreement's effect date, Amber was required to inform NC Interactive in writing of its initial marketing plan for supporting distribution and sale of the Game. *Id.* Section 5.

22.    Under the Agreement, Amber was also required to protect NC Interactive's Confidential Information and to not disclose NC Interactive's Confidential Information to a third party without NC Interactive's prior consent. *Id.* Section 10(a). The Agreement defines Confidential Information to include "proprietary information . . . including, without limitation, information, data, know-how, software, source code, translations, compilations, and copies or

COMPLAINT - 5
Case No. 2:22-cv-1251

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1   derivative works thereof" and "other information that, by the nature of the circumstances

2   surrounding its disclosure, ought to be treated in good faith as proprietary and/or confidential." *Id.*

3   Section 1(d).

### Amber's Failure to Perform the Agreement

5   23.   Amber failed to comply with its obligations under the Agreement.  Specifically,

6   Amber did not:

7        a.  deliver any written development or distribution plan within 60 days of the

8            Agreement's effective date;

9        b.  inform NC Interactive in writing of its initial marketing plan within six months of

10           the Agreement's effect date;

11       c.  develop the Game and launch it commercially;

12       d.  adhere to Amber's confidentiality obligations; or

13       e.  pay any royalties to NC Interactive arising from the millions of dollars Amber

14           generated using NC Interactive's intellectual property and Confidential

15           Information.

16  24.   In fact, at the time NC Interactive terminated the Agreement in July 2022—more

17  than nine months after the Agreement's effective date—Amber had not delivered any of the

18  required documents or developed the Game in any meaningful way.

### Amber's Misuse of NC Interactive's Property

20  25.   In or about January 2022, NC Interactive learned that Amber had partnered with a

21  third party, known as Syndicate, to monetize the Game by rebranding the Game as "Syn City" and

22  creating and selling NFTs using NC Interactive's intellectual property.[1]  Syndicate's website,

23  syn.city, and related social media pages, which were collectively used to generate interest in its

---

[1] An NFT is a unique, non-fungible digital asset recorded on a blockchain (a type of distributed ledger) that can represent and certify its owner's right to, and enable its owner to access, specific digital content associated with the NFT.

COMPLAINT - 6
Case No. 2:22-cv-1251

sale of the NFTs, prominently featured gameplay footage and characters from the Game.[2] Amber did not notify or seek NC Interactive's permission prior to entering into an agreement to transfer NC Interactive's intellectual property to Syndicate.

26. Upon information and belief, in the Amber/Syndicate agreement, Amber sub-licensed or assigned rights to the Game and/or NC Interactive's intellectual property to Syndicate as part of a partnership. Upon information and belief, Amber also shared NC Interactive's Confidential Information with Syndicate, such as details about the unpublished Game and marketing strategy. Amber has never provided NC Interactive with a copy of the Amber/Syndicate agreement but has described aspects of the agreement via email and oral communications.

27. Syndicate and Amber failed to run proper trademark clearance of Syn City and consequently received complaints that Syn City infringed Frank Miller, Inc.'s rights to its SIN CITY marks (US registration numbers 4121720; 1875224).[3] Consequently, in approximately January 2022, Amber's representatives informed NC Interactive that it was working with Syndicate to change the name of the Game from Criminal Empire to "MOBLAND".  In February 2022, Syndicate set up mob.land, a website that featured art assets for MOBLAND and rebranded its Twitter and Discord accounts to @MobLandHQ and discord.gg/mobland respectively. The art assets on Syndicates website, Twitter, and Discord included the use of NC Interactive's images taken from the Game's Google Play store listing and from game footage recorded by the Game's users during its brief publishing run as well as other NC Interactive code and proprietary, non-public information and trademarks. Amber's representatives further stated that Syndicate had been selling NFTs relating to anticipated Game features.

---

[2] See, e.g., gameplay footage uploaded by the YouTube channel AK TOPUS GAMING on April 16, 2022 https://youtu.be/pkGHdWnTe34?t=216. Compared to a cached copy of the syn.city website from January 31, 2022 https://web.archive.org/web/20220131140904/https://syn.city/.

[3] https://medium.com/@MOBLANDHQ/mob-land-the-mafiametaverse-evolution-65cf8515f642

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

28.   Amber did not seek NC Interactive's permission to use the art assets or to create NFTs using intellectual property associated with the Game—a Game Amber has failed to develop as contemplated by the Agreement.

29.   On information and belief, Amber allowed Syndicate to create the website https://mob.land. As of February 17, 2022, the MOBLAND website stated it made sales of over 8,000 NFT for a total of more than $3 million in revenue:



30.   The MOBLAND website continues to offer for sale on its "Marketplace" page various NFT generated in whole or in part from NC Interactive's intellectual property. On information and belief, the NFT for sale on the MOBLAND website are copies or derivatives of images and code from NC Interactive's intellectual property. An example of the sales webpage as of August 29, 2022 is as follows:



COMPLAINT - 8
Case No. 2:22-cv-1251

31.     An affiliate of NC Interactive, known as Mobland Games, LLC, has applied for registration of various trademarks, including but not limited to the term "MOBLAND" for use with NFT under United States trademark Serial Number 97290467.

32.     In or around April 2022, Amber sent a royalty statement to NC Interactive admitting that Amber (through the MOBLAND website) had been selling NFTs created from NC Interactive's intellectual property since December 2021. Several examples of the Amber/Syndicate use of NC Interactive's intellectual property are attached as Exhibit C to this Complaint.

33.     In or around June 2022, Amber's CEO acknowledged in a statement to NC Interactive's CEO that Amber owed NC Interactive at least $138,378.70 arising from NFT sales, assuming such sales were properly authorized under the Agreement and subject to the royalty-rate payments set forth in the Agreement.

34.     Amber also disclosed to NC Interactive that Syndicate was refusing to pay Amber for NFT or other sales Syndicate had completed with the use of NC Interactive's intellectual property. Amber asserted that Syndicate was in breach of the Amber/Syndicate agreement.

35.     Amber has lost control of NC Interactive's intellectual property and, on information and belief, has not initiated legal action to seek an injunction against Syndicate's continued use and sale of NC Interactive's property in the marketplace.

36.     On July 15, 2022, NC Interactive provided written notice to Amber stating that NC Interactive was terminating the Agreement effective immediately due to Amber's failure to perform its obligations. NC Interactive demanded that Amber pay the minimum of $138,378.70 in royalties arising from Amber's unauthorized NFT sales related to the Game. A copy of the termination letter is attached as Exhibit B.

37.     Pursuant to Section 9(c) of the Agreement: "Upon termination or expiration of this Agreement, all licenses granted to Licensee hereunder shall immediately be terminated, and Licensee shall immediately stop operating, providing the Game and/or Game Services." Despite

COMPLAINT - 9
Case No. 2:22-cv-1251

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

the termination of the license, Amber (through its agreement with Syndicate) continues to use and sell NFT created using NC Interactive's intellectual property.

38.     To date, Amber has refused to pay NC Interactive any amounts arising from Amber's monetization of NC Interactive's intellectual property. Amber has also failed to cease using and return NC Interactive's property.

39.     Amber has caused reputational and brand harm to NC Interactive by willfully marketing (or causing Syndicate to market outside the scope of the Agreement) NFTs using NC Interactive's intellectual property without NC Interactive's knowledge or permission. Such NFTs relate to a video game title that NC Interactive has no immediate expectation of releasing because Amber failed to develop the Game.

**Indemnification of Damages and Costs**

40.     Amber is obligated by the Agreement to broadly indemnify and hold NC Interactive harmless for all manner of "damages and costs (e.g. reasonable attorney's fees) arising out of or in connection with Licensor's gross negligence or willful misconduct." Agreement Section 8(c). This obligation is not limited to damages and costs incurred or caused by third parties, as distinguished from other indemnification obligations in the Agreement.

41.     Amber's intentional and willful misuse of NC Interactive's intellectual property— including but not limited to transferring that intellectual property to Syndicate without NC Interactive's knowledge or consent—obligates Amber to indemnify NC Interactive for all damages and costs arising therefrom.

**Governing Law**

42.     Pursuant to Section 13(b) of the Agreement: "This Agreement, and all disputes, claims, actions, suits or other proceedings arising hereunder, is governed by and enforced under the laws of the United States and the State of Washington, but excluding its conflict of law provisions that would require the application of the laws of any other jurisdiction and excluding the United Nations Convention on Contracts for the International Sale of Goods."

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

# V.    CAUSES OF ACTION

## Count I - Breach of Contract

43.    NC Interactive incorporates by reference as if expressly set forth in this paragraph the preceding factual allegations in paragraphs 1–42 of this Complaint.

44.    NC Interactive and Amber are parties to the Agreement, which forms a valid and enforceable contract.

45.    The Agreement granted Amber an exclusive, non-assignable, non-sublicensable, royalty-bearing license to use NC Interactive's intellectual property in connection with the Game. The Agreement required Amber to timely provide certain deliverables; to obtain NC Interactive's written approval before using the Game Marks; to not take any action that harms or could reasonably harm goodwill associated with the Game Marks or NC Interactive's other marks; and to protect NC Interactive's Confidential Information.

46.    Any and all conditions precedent to Amber's performance of its contractual obligations under the Agreement have been satisfied or waived.

47.    Through the conduct described above, Amber breached the Agreement by, at minimum, failing to submit written deliverables within the specified time; using NC Interactive's intellectual property beyond the scope of the license, including creating NFTs using intellectual property associated with the Game and sub-licensing or assigning NC Interactive's intellectual property to a third party; using Game Marks on the MOBLAND website without prior written approval from NC Interactive; causing reputational harm to NC Interactive by using its intellectual property to create NFTs without a right to do so and without having developed the Game; assigning, sub-licensing and/or transferring NC Interactive's Confidential Information to Syndicate without notice to or authorization from NC Interactive; and refusing to pay NC Interactive any royalties, which Amber admits to being a minimum of $138,378.70.

48.    As a proximate result of Amber's breach of the Agreement, NC Interactive suffered damages in an amount to be proven at trial.

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

**Count II – Unjust Enrichment**

49. NC Interactive incorporates by reference as if expressly set forth in this paragraph the preceding factual allegations in paragraphs 1–42 of this Complaint.

50. Separately and in the alternative to Count I, to the extent Amber used NC Interactive's intellectual property outside the scope of the license provided in the Agreement, Amber is liable under Washington law under the equitable doctrine of unjust enrichment.

51. NC Interactive conferred a benefit upon Amber when it transferred NC Interactive's intellectual property and non-public, proprietary information to Amber. Without a license or other contractual right to do so, Amber used NC Interactive's property to partner with Syndicate to create and sell NFTs without the necessary contractual rights. Additionally, the Agreement terminated in July 2022 and Amber continues to use NC Interactive's property without any contractual rights.

52. Amber retained the benefit of NC Interactive's property outside the scope of the license with appreciation or knowledge of the benefit conferred.

53. Amber's retention of revenue earned from the NFTs created from an unlicensed and unauthorized use of NC Interactive's intellectual property make it inequitable for Amber to retain the benefit without payment of its value. To the extent of Amber's use of NC Interactive's intellectual property outside the scope or duration of the Agreement, Amber should be required to transfer all revenue (not merely a royalty percentage) to NC Interactive.

**Count III – Direct or Contributory Copyright Infringement**

54. NC Interactive incorporates by reference as if expressly set forth in this paragraph the preceding factual allegations in paragraphs 1–42 of this Complaint.

55. Separately and in the alternative to Counts I and II, to the extent Amber used NC Interactive's intellectual property outside the scope of the license provided in the Agreement, Amber is liable for direct copyright infringement and/or contributory copyright infringement.

56. All elements of the Game that NC Interactive provided to Amber, and all stages of development and production of the Game, are original works containing copyrightable subject

COMPLAINT - 12
Case No. 2:22-cv-1251

matter for which copyright protection exists under the Copyright Act, 17 U.S.C. § 101, et seq.  NC Interactive is the exclusive owner of rights under copyright in and to the Game and all derivative works and elements thereof. The Game was first published exclusively in the Philippines and thus is a foreign work (i.e., non-United States work) under the Copyright Act. NC Interactive has filed a pending application for the Game and elements thereto before the U.S. Copyright Office.

57.     Through Amber's conduct alleged herein, including but not limited to Amber's use (or allowing Syndicate to use) the Game to create and sell unauthorized NFTs and other preparation and reproduction of derivative works based on the Game without NC Interactive's permission, Amber has directly or contributorily infringed NC Interactive's exclusive rights in the Game and the elements thereof in violation of Section 501 of the Copyright Act, 17 U.S.C. § 501.

58.     Amber's infringing conduct was and continues to be willful and with full knowledge of NC Interactive's rights in the Game. Alternatively, Amber knew of Syndicate's copyright infringement and Amber induced, caused or materially contributed to Syndicate's infringement on NC Interactive's rights through an agreement or partnership with Syndicate and transfer of the Game assets to Syndicate without license or authorization. As a result of such willful and direct infringement or contributory infringement, Amber has illegally profited from NC Interactive's rights.

59.     As a direct and proximate result of Amber's infringing or contributorily infringing conduct alleged herein, NC Interactive has been harmed and is entitled to damages in an amount to be proven at trial. Pursuant to 17 U.S.C. § 504(b), Amber is entitled to recovery of Amber's profits attributable to its infringing conduct alleged herein, including from any and all sales of products incorporating or embodying the copyrighted work, and an accounting of and a constructive trust with respect to such profits.

60.     Alternatively, NC Interactive is entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c) for Amber's ongoing, willful infringing conduct, and for such other amount as may be proper pursuant to 17 U.S.C. § 504(c).

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

61.     As a direct and proximate result of the Amber's infringing conduct alleged herein, NC Interactive has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. On information and belief, and based upon the MOBLAND website statements, unless Amber's infringing conduct is enjoined by this Court, Amber will continue to infringe the copyrighted work. NC Interactive therefore is entitled to permanent injunctive relief restraining and enjoining Defendants' ongoing infringing conduct.

## VI.     REQUEST FOR RELIEF

NC Interactive respectfully asks this Court to grant the following relief:

A.     Judgment in favor of NC Interactive and against Amber for breach-of-contract damages in an amount to be proven at trial.

B.     Equitable restitution and disgorgement of revenue in an amount to be proven at trial.

C.     Judgment in favor of NC Interactive and against Amber for copyright infringement damages in an amount to be proven at trial.

D.     An injunction requiring Amber to return all of NC Interactive's intellectual property and information and preventing further violations of NC Interactive's rights in and to the Game.

E.     An award of pre- and post-judgment interest.

F.     An award of attorneys' fees and costs under any agreement, statute, or rule authorizing such an award.

G.     Such other and further relief as this Court deems just and equitable.

//

//

//

//

//

COMPLAINT - 14
Case No. 2:22-cv-1251

1    DATED this 7th day of September, 2022.

2                                                    K&L GATES LLP

3                                                    By    s/ Christopher M. Wyant
                                                     Christopher M. Wyant, WSBA #35561
4                                                    By    s/ Ruby Nagamine
                                                         Ruby Nagamine, WSBA # 55620
5                                                    925 Fourth Avenue, Suite 2900
                                                     Seattle, WA  98104
6                                                    Phone:  (206) 623-7580
                                                     Fax:  (206) 623-7022
7                                                    E-mail:  chris.wyant@klgates.com
                                                                     ruby.nagamine@klgates.com
8

9                                                    Attorneys for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT - 15
Case No. 2:22-cv-1251